## UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTICT OF VIRGINIA
### Alexandria Division

|                                    |     |                              |
|------------------------------------|-----|------------------------------|
| In re:                             | )   |                              |
|                                    | )   |                              |
| Sonoma Cellar LLC,                 | )   | Case No. 24-11780-KHK        |
|                                    | )   | Chapter 11 (Subchapter V)    |
|                                    | )   |                              |
| Debtor.                            | )   |                              |
|                                    | )   |                              |

### MEMORANDUM OPINION

In December of 2022, Richard and Elizabeth Myllenbeck (the "Myllenbecks") sold their ownership interests in Sonoma Cellar, LLC ("Sonoma" or the "Debtor") to Daniel Wharam under a sale agreement. Docket No. 186 (Agreement for Sale and Purchase of Sonoma Cellar, LLC). Thereafter, a dispute arose with respect to certain refundable employee retention tax credits ("ERCs") payable to the Debtor that were attributable to the two-year period prior to the closing of the sale. The Debtor and Mr. Wharam ultimately filed for and obtained certain of those ERCs and apparently some are still in process with the Internal Revenue Service (the "IRS"). The Debtor and Mr. Wharam believe that under the sale agreement, the credits belong to the Debtor. The Myllenbecks, asserting various theories sounding in contract, constructive trust and conspiracy law, believe that the credits belong to them. While the Myllenbecks have asserted various theories of recovery, at core this is primarily a contract dispute that requires the Court to determine whether the express sale agreement or an implied-in-fact contract entitles the Myllenbecks to the ERCs, or alternatively, if the Debtor and Mr. Wharam are the rightful recipients of the ERCs.

Based on the record before the Court, and for the reasons that follow, the Court finds that 1) there is no genuine dispute of material fact and that, as a matter of law, the Myllenbecks are the rightful recipients of the ERCs pursuant to an implied-in-fact contract between the Debtor, the

Myllenbecks and Mr. Wharam, 2) there is no genuine dispute of material fact and that, as a matter

of law, a constructive trust in favor of the Myllenbecks arose with respect to the credits that have

been received and shall arise with respect to any future credits received by the Debtor, and 3) that

the Myllenbecks are not entitled to summary judgment with respect to their conspiracy or tortious

interference claims or their request for punitive damages or attorneys' fees asserted in connection

therewith.

### Uncontested Facts

Sonoma Cellar, LLC is a limited liability company formed under the laws of the

Commonwealth of Virginia.  Sonoma operates a wine-bar and restaurant on King Street in Old

Town in Alexandria, Virginia.

A.  The Sale of Sonoma

In December of 2022, the Myllenbecks, who, at the time, owned Sonoma, entered into a

sale agreement with Daniel Wharam.  Although the parties seem to agree that the sale agreement

was not a model of draftsmanship, its purpose was to effectuate the sale of the Myllenbecks'

ownership interests in Sonoma to Mr. Wharam for $500,000.  Docket No. 185, pg. 6.  Among

other provisions, the sale agreement included the following language in paragraph 8:

> Allocation of Obligations, Payments, and Credits; Prorations. To the fullest
> extent reasonably possible and practicable, the parties shall allocate all obligations
> due, and all credits to be received or payable, in any such instance, that pertain to
> the Company and the operation of the Business by reference to the time and date
> that each obligation or credit, as applicable, was incurred or accrued and whether
> this occurred before or after Closing. Sellers shall be responsible for the payment
> of all such obligations that were incurred by the Company and shall be entitled to
> receive all credits that accrued to the Company, in each such instance prior to the
> time and date of Closing. Conversely, Purchaser shall be responsible for the
> payment of all obligations that were incurred by the Company after the time and
> date of Closing and shall be entitled to receive all credits that accrued to the
> Company after Closing as well. These payments and credits shall include, without
> limitation, those pertaining to each of the following: all credit-card charges and
> credits; all utility charges and credits; all sales taxes; all fees, charges, and credits

2

applicable to any permit or license; all insurance policies; and all charges imposed, or credits payable, by or from any vendor or any other party that is done, is doing, or will be doing business with the Company. To the extent that any sum has been prepaid by Sellers, that sum shall be prorated to the time and date of Closing, and Seller shall be entitled to a credit from the Purchaser for the amount that has been prepaid that is applicable to any time or period after Closing. Conversely, to the extent that any amount is billed after Closing, or remains unpaid after Closing, and, in either such instance, pertains to a period that preceded Closing, Purchaser shall be entitled to a credit for such amount(s) from Sellers with respect to the portion of the charge that pertains to any period that occurred prior to Closing. Not later than forty days after Closing, the parties shall exchange itemizations of the credits, debits, and prorations that are covered by this section, and within five days thereof, either Sellers or Purchaser, as applicable shall pay the full amount of the net amount due. To the extent that more obligations and/or credits become apparent after the date that falls forty-five days after the Closing, or to the extent that some items were not agreed to by the parties at such time, the party shall exchange a second list of itemizations eighty-five days after Closing, and shall resolve all such items and amounts on or prior to the date that shall fall ninety days after the Closing. The parties, at all relevant times, shall act reasonably and in good faith in seeking to calculate all amounts that are owed and payable under this Section and to make timely payment of all such sums owed to another party.

Docket No. 186, pgs. 3-4.  The sale of Sonoma closed on December 15, 2022.  The ownership interests were sold to Daniel Wharam alone, but his wife, Stacey Wharam, is involved in the operations of the Debtor as well as other business ventures owned by the Wharams.  The Wharams have continued to operate Sonoma since the purchase.

B.  The Employee Retention Tax Credits Dispute

In April of 2022, the Myllenbecks consulted with accountants in attempts to start commencing the work necessary to apply for employee retention credits for 2020 and 2021 in relation to Sonoma.  Docket No. 185-1, pg. 1 (Declaration of Elizabeth Myllenbeck) ("Myllenbeck Declaration"); Docket No. 185, pg. 12.  On December 28, 2022, Elizabeth Myllenbeck texted Stacey Wharam advising her of the Myllenbecks' attempts to apply for the ERCs.  Myllenbeck Declaration, pg. 8. On December 29, 2022 the Myllenbecks emailed Stacey Wharam, asserting

therein that the Myllenbecks were entitled to the ERCs pursuant to paragraph 8 of the sale agreement. Myllenbeck Declaration, pg. 8; Docket No. 188-12.

On January 3, 2023, the Myllenbecks, through an accounting firm, applied for the 2020 and 2021 ERCs, but apparently these applications were rejected. See Docket Nos. 189, 189-1, 189-2, 189-3, 189-4, 189-5 (Form 941-X for second, third and fourth quarters of 2020 and first, second and third quarters of 2021); Docket No. 200-1, pg. 3 (Declaration of Stacey Wharam) ("Wharam Declaration").   The Myllenbecks assert that they expended $43,532.33 in their attempts to apply for the ERCs. Docket No. 185, pg. 16, Docket No. 189-8 (Payment confirmations).   On January 5, 2023, the Myllenbecks and the Wharams exchanged emails regarding who would retain use of Sonoma's employee identification number ("EIN") after the sale. Docket No. 189-6 (E-mails between Elizabeth Myllenbeck, the Wharams and the Wharams' counsel).   Ultimately, the Defendants retained the EIN. Wharam Declaration, pg. 3.

On March 10, 2023, the Myllenbecks, by counsel, gave notice to Mr. Wharam's counsel that they asserted a right to at least $435,000 in ERCs under paragraph 8 of the sale agreement. Docket No. 189-10 (March 10, 2023 e-mail between Matthew A. Clary and Marc Miller). Sometime between March and June of 2023, Mr. Wharam applied for the 2020 and 2021 ERCs. Docket No. 189-11 (Deposition of Joseph Love discussing preparation of forms to apply for ERCs at Stacey Wharam's direction on behalf of Sonoma); Docket Nos. 190, 190-1, 190-2, 190-3, 190-4, 190-5 (Form 941-X submitted for 2020 through 2021).   In June of 2023, the Myllenbecks received mail at their home containing correspondence from the IRS and six checks made payable to Sonoma and Daniel Wharam. Myllenbeck Declaration, pg. 10; Docket Nos. 190-7, 190-8, 190-9, 190-10, 190-11, 190-12 (IRS checks payable to Sonoma and Mr. Wharam). The Myllenbecks later discovered in yet-to-be-filed litigation that the checks were for the 2020 and 2021 ERCs.   *Id*.

On July 11, 2024 the Myllenbecks learned that the Wharams had apparently applied for and received six replacement checks issued by the IRS for the 2020 and 2021 ERCs totaling $474,914.31 and that the checks had been deposited, and the money spent.  Docket Nos. 191-7, 191-8 (July 11, 2024 e-mails between Marc Miller and Matthew A. Clary).

On August 4, 2023, the Myllenbecks filed suit against the Debtor, the Wharams and others in the Alexandria Circuit Court, asserting the various causes of action that underly the proof of claim filed in this case.

C.  The Bankruptcy Filing and the Myllenbeck Claim

On September 24, 2024, Sonoma filed a voluntary petition under Subchapter V of Chapter 11 of the Bankruptcy Code.  On December 2, 2024, Richard and Elizabeth Myllenbeck filed Claim 2-1 seeking to recover $1,874,742.93 relating to the ERCs that were the subject of the pending litigation in the Alexandria Circuit Court.  Claim 2-1.[1]  The attachments to Claim 2-1 include a summary itemization of the amounts sought in the proof of claim as well as a verified complaint that was filed in the Alexandria Circuit Court.   Primarily[2], the Myllenbeck Claim seeks $474,914.31 in IRS refunds for ERCs relating to six quarters of 2020 and 2021 that the Myllenbecks assert were wrongfully diverted from them in contravention of the sale agreement. Claim 2-1, Part 2, pg. 1.  Ultimately, the Myllenbecks argue, among other things, that the Debtor and Mr. Wharam held the ERCs in constructive trust for the Myllenbecks either by virtue of the express sale agreement or through a purported implied-in-fact contract between the Debtor, the Myllenbecks and Mr. Wharam.

---

[1] References to "Claim" refer to the proof of claim filed on the Claims Register in the above-captioned case.
[2] The Myllenbecks also seek treble damages, punitive damages, pre-judgment and post-judgment interest and attorneys's fees.

On April 14, 2025, the Debtor objected to Claim 2-1, arguing that the credits belonged to the Debtor, not the prior owners, and that the Myllenbecks could not meet the standard to impose a constructive trust over the funds.  Docket No. 144.  Subsequently, the Myllenbecks filed a response to the Debtor's Objection, opposing the disallowance of their Claim.  Thereafter, the Court entered a Scheduling Order (Docket No. 174) setting a date for a hearing on the Debtor's Claim Objection and setting exhibit and witness lists deadlines.

D. The Summary Judgment Motions

On September 3, 2025, the Myllenbecks filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure (the "Civil Rules"), as incorporated by Rule 7056 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (Docket Nos. 185, 194[3]) (the "Myllenbecks' Motion").  Later, the Debtor and Mr. Wharam responded, filing an Objection to the Myllenbecks' Motion (Docket No. 198) and a Cross-Motion for Summary Judgment (Docket Nos. 199, 200) (the "Debtor's Motion").

The Court held a hearing on the dispute on October 28, 2025, and after presentation by the Debtor and the Myllenbecks, took the matter under advisement.

## Conclusions of Law

The Court has jurisdiction over this matter under 28 U.S.C. § 1334 and the Order of Reference entered by the U.S. District Court for this District on August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate) and (B) (allowance or disallowance of claims against the estate).

Summary judgment is appropriate where there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Bankr. P. 7056. The

---

[3] On September 1, 2025, the Myllenbecks filed a corrected motion for summary judgment.  (Docket No. 194).

moving party has the initial burden of showing that there are no material facts in dispute, and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). When the moving party has met its initial burden, the burden then shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Whether a fact is material or not depends on the substantive law at issue in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action." *Celotex Corp.*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

The dispute before the Court is a claim objection under 11 U.S.C. § 502(b)(1), but more specifically centers around theories of contract law, both express and implied, as well as tortious interference, conspiracy and constructive trust law.

   I.   The Myllenbecks' Positions

The Myllenbecks maintain in their Motion that the ERCs from 2020 and 2021 were wrongfully diverted from them in contravention of the deal contemplated between the parties. Specifically, the Myllenbecks argue that the sale agreement provides that the ERCs that accrued during the pre-closing period should belong to them. Further, conceding that the sale agreement did not include the Debtor as a party, they argue that an implied-in-fact contract exists between the Debtor, the Myllenbecks and Mr. Wharam. In support thereof, the Myllenbecks cite to *Spectr-4, LLP v. Uniwest Commercial Realty Inc.*, 290 Va. 36 (2015) and *Hendrickson v. Meredith*, 161 Va. 193

(1933). According to the Myllenbecks, because the ERCs related to payroll periods that pre-dated the closing of the sale of Sonoma to Mr. Wharam, the ERCs "accrued" prior to the closing for purposes of paragraph 8 of the sale agreement.

Because of the alleged contract breaches, the Myllenbecks argue that a constructive trust should be imposed over the ERCs that were already obtained as well as any that were still being processed with the IRS and that the ERCs should therefore be excluded from the estate under section 541(d) of the Bankruptcy Code.[4] In support thereof, the Myllenbecks cite to *Spectr-4, LLP v. Uniwest Commercial Realty Inc.*, 290 Va. 36 (2015) and *Hendrickson v. Meredith*, 161 Va. 193 (1933).

The Myllenbecks also assert that the Debtor, the Wharams and others 1) tortiously interfered with the Myllenbecks' contractual rights to the ERCs; 2) engaged in business conspiracy under Va. Code §§ 18.2-499(A) and 18.2-500; and 3) committed civil conspiracy to injure the Myllenbecks and deprive them of the ERCs.

As damages, the Myllenbecks seek $1,424,741.93, representing treble the base amount of the 2020 and 2021 ERCs, punitive damages in the amount of $350,000 and further equitable relief relating to additional potential ERCs that are still being processed by the IRS. Finally, the Myllenbecks also request pre-judgment interest, post-judgment interest and attorneys' fees.

II.    The Debtor's and Mr. Wharam's Positions

The Debtor and Mr. Wharam argue through their Objection and Motion that the ERCs belonged to the Debtor and that the sale agreement did not impose an obligation on the Debtor with respect to the ERCs. Docket No. 144, pg. 1. Additionally, the Debtor and Mr. Wharam maintain that the ERCs did not "accrue" for purposes of paragraph 8 until the Debtor elected to

---

[4] Section 541(d) excludes from the estate property in which the estate only holds bare legal title. According to the Myllenbecks, they hold the equitable or beneficial interest in the ERCs as a result of constructive trust law.

take, or in other words, apply for the credits, post-closing.  In support thereof, the Debtor cites to IRS Notice 2021-20, entitled "Guidance on the Employee Retention Credit Under Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act" which provides, among other things, that the credits are an election and if the credit is not claimed on the taxpayer's federal employment tax return, then the taxpayer is deemed to have not elected the credit.  The Debtor also argues that because the IRS does not allow interest to accrue on the refund until it is elected this is a further indication that the credit does not accrue until elected.  The Debtor cites no authority for this proposition.

The Debtor also argues that the ERCs were not transferred in the sale agreement and that because the EIN remained with the Debtor due to the structuring of the sale as a sale of the limited liability company interests, the ERCs at issue belong to the Debtor.  Further, the Debtor argues that even if paragraph 8 of the sale agreement imposed an obligation to turn over the ERCs to the Myllenbecks, that the Myllenbecks did not timely request the credit.  In particular the Debtor responds that the forty-day limitation under paragraph 8 was not met.  With respect to the implied-in-fact contract argument, the Debtor argues that because the sale agreement provided that payments thereunder would not be completed in less than one year, any obligation of the Debtor had to be in a signed writing under Virginia's statute of frauds.  Va. Code. § 11-2(8).  The Debtor also maintains that the requirements of a constructive trust cannot be proven in this case.  Docket No. 144, pgs. 1-2.

III.    Analysis

A. Whether the sale agreement or an implied-in-fact contract entitles the Myllenbecks to the ERCs

1. Whether the Sale Agreement entitles the Myllenbecks to the ERCs

The Court must first determine whether the sale agreement, and in particular, paragraph 8 thereof, entitles the Myllenbecks, or alternatively, the Debtor and Mr. Wharam to the ERCs at issue. There is no dispute that Virginia law governs this dispute. Under Virginia law, contracts must be interpreted to "give effect to the intention of the parties as expressed in the language of their contract." *Martin & Martin, Inc. v. Bradley Enters., Inc.*, 256 Va. 288, 291 504 S.E.2d 849, 851 (1998) (quoting *Rash v. Hilb, Rogal & Hamilton Co.*, 251 Va. 281, 286 467 S.E.2d 791, 794 (1996)). Absent ambiguity, the Court must apply the plain language of the contract. *Amos v. Coffey*, 228 Va. 88, 92, 320 S.E.2d 335, 337 (1984).

Contract language is ambiguous "when it may be understood in more than one way or when such language refers to two or more things at the same time." *Salzi v. Va. Farm Bureau Mut. Ins. Co.*, 263 Va. 52, 55–56, 556 S.E.2d 758, 760 (2002). Ambiguity is a question of law. *Wilson v. Holyfield*, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984). Disagreement between the parties as to the meaning of a particular term is not enough to create ambiguity. *Id*. Further, just because a term is broad, that does not mean it is ambiguous. *Wilson*, 313 S.E.2d at 398 (Virginia law prohibits the Court from reading into the contract "language which will add to or take away from the meaning of the words already contained therein.").

With these principles in mind, the Court turns to the language of paragraph 8 of the sale agreement. The following language from paragraph 8 is particularly relevant to the dispute:

> **To the fullest extent reasonably possible and practicable**, the parties shall allocate all obligations due, and all credits to be received or payable, in any such instance, that pertain to the Company and the operation of the Business by reference to the time and date that each obligation or credit, as applicable, was incurred or accrued and whether this occurred before or after Closing. **Sellers shall be responsible for the payment of all such obligations that were incurred by the Company and shall be entitled to receive all credits that accrued to the Company, in each such instance prior to the time and date of Closing**. Conversely, Purchaser shall be responsible for the payment of all obligations that were incurred by the Company after the time and date of Closing and shall be

entitled to receive all credits that accrued to the Company after Closing as well. These payments and credits shall **include, without limitation**, those pertaining to each of the following: all credit-card charges and credits; all utility charges and credits; all sales taxes; all fees, charges, and credits applicable to any permit or license; all insurance policies; and all charges imposed, or credits payable, by or from any vendor or any other party that is done, is doing, or will be doing business with the Company… (emphasis added)

This provision, distilled to its core, expresses the parties' intent to allocate credits and obligations between seller and purchaser temporally, based on whether the obligation or credit accrued pre-closing or post-closing.  The language used is broad and is qualified by the lead in of "[t]o the fullest extent reasonably possible and practicable."  Further, while the term "credits" is not defined and an illustrative list of examples is provided, that list is qualified by the language "shall include, without limitation" indicating that the list is not meant to limit, but instead, illustrate potential types of credits and payments.  The dispute between the parties centers on the meaning of "accrue", and on whether "credits" includes the ERCs at issue.  Given that the provision indicates that Seller and Purchaser, as applicable, "shall be entitled to receive all credits that accrued to the Company" (emphasis added) during the applicable pre-closing or post-closing period, the Court finds that the term credits is not ambiguous, it is just broad.  A more difficult question is the meaning of the term "accrue".  The agreement does not define "accrue" and the parties disagree on whether the ERCs accrued to the Company upon the election being filed with the IRS, or at an earlier time when the relevant payroll expenses were originally paid.   The parties have not cited any caselaw to support their positions on this point.

The Court has found no case authority on point, but given that the ERCs are tax credits from the IRS, the Court finds the Eleventh Circuit case of *United States. v. Cruz*, to be helpful.  There, the court observed that the Supreme Court has held that "tax is deemed to accrue when all events have occurred which fix the amount of the taxpayer's income, deductions, or credit, and determines

the liability of the taxpayer for tax, although there has not yet been an assessment or maturity."

*United States v. Cruz*, 698 F.2d 1148, 1151 (11th Cir. 1983) (citing *United States v. Anderson*, 269

U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926); and *Dixie Pine Products Co. v. Commissioner of*

*Internal Revenue*, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270 (1944)).  The *Cruz* court went on to

hold that the accrual of a foreign tax credit is essentially governed by the same rule.  *Id*.  With

respect to the foreign tax credit, the final event which fixed the amount of the credit was the levy

of the foreign tax.

Analogized to the ERC, the final event, as is relevant here, would be the payment of covered

wages during the eligibility period.  Of course, additional paperwork is necessary to actually obtain

the benefit of the credit, but the same is true of the foreign tax credit.  The same is also true of

virtually any lawsuit where the cause of action itself accrues, for example, upon occurrence or

knowledge of the injury, but relief is not obtained by the plaintiff until after the lawsuit is filed and

prosecuted to disposition.  *See e.g., CTS Corp. v. Waldburger*, 573 U.S. 1, 8, 134 S. Ct. 2175,

2181, 189 L. Ed. 2d 62 (2014) (personal injury or property damage action accrues when injury

occurs or is discovered).  This interpretation of "accrue" also comports with the language of

paragraph 8.  In particular, paragraph 8 refers to credits that accrued during the pre-sale and post-

sale period.  Such credits can only be applied for by the Debtor and its current owner(s).  If such

credits (or the right to apply for them) did not "accrue" until they were applied for, the pre-sale

credit entitlement provision would be meaningless because any credits that had "accrued" pre-

closing would have already been applied for by the Debtor under the previous ownership (and

likely be in the previous owners' possession), and any post-closing credits would only inure to the

new ownership.  As a result, on that reading, there would be no need to carve-up the right to credits

that accrued prior to or after the closing date of the sale because once ownership changed, the only party to whom the credits would accrue would be the new owners.

While the Debtor argues that the way interest accrues on the ERCs indicates that they do not accrue until applied for, the Court finds that this does not control, particularly where the Debtor has cited no authority to support this proposition and given the way federal law treats accrual of other types of tax credits.

Based on the foregoing, the Court finds that there is no genuine dispute of material fact with respect to paragraph 8 of the sale agreement, that the terms "credits" and "accrue" are not ambiguous and that the effect of paragraph 8 is to entitle the Myllenbecks to the ERCs attributable to the operations of the business that occurred prior to the close of the sale of Sonoma. As a result, the Court finds that Mr. Wharam, at minimum, was under an obligation, pursuant to paragraph 8, "[t]o the fullest extent reasonably possible and practicable," to allocate the ERCs attributable to the pre-closing period to the Myllenbecks. Given that he has full control of the Debtor, there is no question that it was reasonably possible and practicable to ensure the Myllenbecks received those ERCs.

This does not, however, end the inquiry. It is undisputed that the Debtor is not party to the sale agreement, and further it is undisputed that the ERCs at issue are payable to the Debtor. However, it is also undisputed that every person that owned, and therefore, controlled, the Debtor pre and post closing were parties to the sale agreement. While they did not expressly sign the agreement on behalf of the Debtor, they did sign the agreement in their personal capacities, which are the capacities in which they hold (or held) their interests in the Debtor. Further, the clear intent of the parties was to address, at least with respect to the agreements in paragraph 8, allocation of the Debtor's property. This begs the question, should a contract be implied in fact between the Debtor,

the Myllenbecks and Mr. Wharam with respect to the obligations outlined in paragraph 8 of the sale agreement.

2.  Whether a contract should be implied-in-fact between the Debtor, Mr. Wharam and the Myllenbecks

Virginia law recognizes two types of implied contracts: contracts implied-in-fact and implied-in-law contracts. *City of Norfolk v. Norfolk Cnty.*, 120 Va. 356, 363, 91 S.E. 820, 822 (1917). As is relevant here, "[i]mplied-in-fact contracts are no different from express contracts except that, instead of "all of the terms and conditions [being] expressed between the parties, ... some of the terms and conditions are implied in law from the conduct of the parties." *Hendrickson v. Meredith*, 161 Va. 193, 200, 170 S.E. 602, 605 (1933). "Like an express contract, an implied-in-fact contract is created only when the typical requirements to form a contract are present, such as consideration and mutuality of assent." *City of Norfolk*, 120 Va. at 361–62, 91 S.E. at 821–22. So, for a contract to be implied-in-fact as to the Debtor, the Court must find, by examination of the conduct of the parties, that mutuality of assent and consideration exist to support the deal. Here, the Court finds that there is no genuine dispute of material fact as to the existence of mutuality of assent. As the Court previously noted, all parties that controlled the Debtor before and after the sale assented to the sale agreement, which included paragraph 8, a provision that was intended to address, at least in part, allocation of property of the Debtor. Accordingly, the Court finds that there is no genuine issue of material fact that the parties, through their conduct in executing the sale agreement, manifested the Debtor's assent and intent to be bound by paragraph 8. The harder question is whether there existed consideration for the agreement to allocate property of the Debtor to the sellers or the purchaser. In other words, what did the Debtor receive for this obligation? The answer is that the Myllenbecks took on obligations of the Debtor that were incurred prior to the

sale.  Those obligations typically would not be the responsibility of the owners of a Virginia limited liability company, but pursuant to the sale agreement, they were assumed by the Myllenbecks. The Court finds that there is no genuine dispute on this point.

The Debtor and Mr. Wharam contend that Virginia's statute of frauds requires the purported implied-in-fact deal between the Debtor and the rest of the parties be in a writing signed by, as is relevant here, the Debtor, because the agreement cannot, by its terms, be performed in less than one year.[5]  The Debtor points to paragraph 2 of the sale agreement which deals with a payment of a portion of the purchase price on an installment basis on a schedule that extends longer than one year.  However, paragraph 2 imposes no obligations with respect to the Debtor or any of the Debtor's property, but instead, only imposes obligations on the Sellers to sell their interests and on the Purchaser to make payment.  *See* Docket No. 186, pgs. 1-2.  There is no basis for the Court to find that any implied-in-fact contract would include the terms of paragraph 2 when it does not even concern the Debtor, and accordingly, no basis for its terms to trigger application of the statute of frauds as to the Debtor.

As a result, based on the foregoing, the Court finds that there is no genuine dispute of material fact that both mutuality and consideration existed to support the sale, and that an implied-in-fact contract existed between the Debtor, the Myllenbecks and Mr. Wharam with respect to the obligations outlined in paragraph 8 of the sale agreement.  Having determined that paragraph 8 imposes an obligation to allocate pre-closing ERCs to the Myllenbecks, the Court next turns to the argument that the deadlines of paragraph 8 were not adhered to.

---

[5] It is worth noting that the only possible agents of the Debtor both pre and post-sale were signatories to the sale agreement.  While they did not indicate that they were signing in a representative capacity, it is undisputed that none of the parties to the sale agreement approached the deal with any particular level of sophistication.  Interestingly, the Debtor, in arguing that civil conspiracy is inappropriate, seemingly concedes that the Debtor was acting through its agents, which would seem to indicate that the Debtor, through its agents, was a party to the sale agreement.

The relevant language of paragraph 8 reads:

Not later than forty days after Closing, the parties shall exchange itemizations of the credits, debits, and prorations that are covered by this section, and within five days thereof, either Sellers or Purchaser, as applicable shall pay the full amount of the net amount due. To the extent that more obligations and/or credits become apparent after the date that falls forty-five days after the Closing, or to the extent that some items were not agreed to by the parties at such time, the party shall exchange a second list of itemizations eighty-five days after Closing, and shall resolve all such items and amounts on or prior to the date that shall fall ninety days after the Closing…

While the Debtor asserts that the forty-day deadline imposed by this language was not met, the Myllenbecks assert that Ms. Myllenbeck notified the Wharams and their counsel in writing within 14 days of closing.  Upon review of paragraphs 38-41, and 43 of the Statement of Undisputed Facts in the Myllenbecks' Motion, and Exhibits 32-34 and 41, the Court finds that there is no genuine dispute of material fact that the Myllenbecks notified the Wharams of the ERCs well within the forty-day deadline. While the Debtor believes that notice was not given until March 10, 2023, in reality, the notice sent on that date was the second notice sent to the Wharams, this time through counsel.  There is no dispute that Ms. Myllenbeck emailed Stacey Wharam and the Wharams' counsel on December 29, 2022, asserting a right to the ERCs pursuant to paragraph 8 of the sale agreement.  As a result, the Court finds that there is no genuine dispute of material fact as to the Myllenbecks' compliance with the forty-day deadline in paragraph 8.

Based on the foregoing, the Court will grant summary judgment in favor of the Myllenbecks on the issue of whether an implied-in-fact contract existed between the Debtor, the Myllenbecks and Mr. Wharam, that imposed the obligations of paragraph 8 on the Debtor, and specifically, the obligation to allocate the pre-closing ERCs to the Myllenbecks.  This grant of summary judgment, of course, includes the $474,914.31 for the existing ERCs and entitles the Myllenbecks to a

judgment against the Debtor[6], which the Court will enter separately, consistent with this Opinion. However, the Myllenbecks also seek to recover the $43,532.33 they expended with tax professionals in attempts to apply for the ERCs.

It is not seriously disputed between the parties that the Debtor alone had the ability to apply for the ERCs. Where the Myllenbecks never had the ability to apply for the ERCs themselves post-closing, it cannot be said that the Debtor or Mr. Wharam's breaches of contractual obligations caused the Myllenbecks to incur the sums they spent trying to apply for the ERCs themselves. In other words, it was the Myllenbecks' mistake that caused them to incur those costs and those sums are not recoverable against the Debtor.

Accordingly, based on the foregoing, the $474,914.31 for the existing ERCs is allowable against the Debtor and the Court will enter judgment for the same against the Debtor.

B. Whether the ERCs are subject to constructive trusts for the benefit of the Myllenbecks

Under Virginia law,

> Constructive trusts arise, independently of the intention of the parties, by construction of law; being fastened upon the conscience of him who has the legal estate, in order to prevent what otherwise would be a fraud. They occur not only where property has been acquired by fraud or improper means, but also where it has been fairly and properly acquired, but it is contrary to the principles of equity that it should be retained, at least for the acquirer's own benefit.

*Leonard v. Counts*, 221 Va. 582, 589, 272 S.E.2d 190, 195 (1980). Constructive trusts must be proven by clear and convincing evidence. *Richardson v. Richardson*, 242 Va. 242, 245, 409 S.E.2d

---

[6] While it is clear to the Court that Mr. Wharam breached paragraph 8 of the sale agreement, it is not clear that the Court has jurisdiction to enter judgment against Mr. Wharam in the context of a claim objection against the Debtor. As a result no judgment shall enter with respect to Mr. Wharam. And, while the Court would not normally enter judgment outside of an adversary proceeding, the Debtor and the Myllenbecks have had a full and fair opportunity to engage in preparation of exhibits, brief and litigate the issues decided herein. Indeed, the parties, prior to proceeding on summary judgment, even set this matter for a trial and largely treated it like an adversary proceeding. *See* Docket No. 174 (Scheduling Order for Discovery and Trial on Claim Objections). Neither party has objected to the Court deciding these issues in the current procedural posture. Therefore, the Court will enter judgment against the Debtor notwithstanding the absence of a separate adversary proceeding.

148, 150 (1991).  The question before the Court is whether retention of the ERCs by Mr. Wharam and the Debtor would be contrary to principles of equity.  The Court finds that it would be.  While the Debtor argues that it would be inequitable to impose a constructive trust due to its payment of taxes on the funds it received in relation to the ERCs and the costs Mr. Wharam expended to obtain them, the Court disagrees. At minimum, Mr. Wharam effectuated an intentional breach of his and the Debtor's obligation to allocate the ERCs to the Myllenbecks.  He knew of the obligation, the language of paragraph 8 was clear, and as the only existing owner of Sonoma post-closing, his knowledge is imputed to Sonoma. Nevertheless, the ERCs were not handed over to the Myllenbecks. They were retained by Mr. Wharam and the Debtor, and it appears a significant portion of the ERC funds that have been obtained thus far have been spent. The Court finds that equity dictates that the ERCs, whether past or in process, not be retained by the Debtor and Mr. Wharam and that a constructive trust arose with respect to the ERCs when the Debtor came into possession of them. *In re Dameron*, 206 B.R. 394, 401 (Bankr. E.D. Va. 1997), subsequently aff'd, 155 F.3d 718 (4th Cir. 1998) (citing *Capital Investors Co. v. Morrison*, 800 F.2d 424, 427 n. 5 (4th Cir. 1986) ("Where the title to property is acquired by one person under such circumstances that he is under a duty to surrender it, a constructive trust immediately arises.... It would seem that there is no foundation whatever for the notion that a constructive trust does not arise until it is decreed by a court. It arises when the duty to make restitution arises, not when the duty is subsequently enforced.")).  The Court, therefore, will grant summary judgment to the Myllenbecks on the issue of whether a constructive trust arose with respect to the processed ERCs and whether any in-process ERCs must be held in constructive trust for the Myllenbecks, and promptly delivered to the Myllenbecks, upon receipt of such ERCs by the Debtor.

As a result, pursuant to section 541(d) of the Bankruptcy Code, the Debtor only held, at most, bare legal title to any remaining ERC funds on the petition date, as such funds were held in constructive trust in favor of the Myllenbecks.  As a result, for this reason too, the $474,914.31 for the existing ERCs is allowable against the Debtor.[7]

With respect to any in-process ERCs, the Court finds that a constructive trust will arise in favor of the Myllenbecks upon receipt of those funds by the Debtor, and that the Debtor must promptly hand such ERCs over to the Myllenbecks upon receipt thereof.

C.   Whether the Debtor is liable for Business Conspiracy or Civil Conspiracy

1.   Whether the Debtor is liable for Business Conspiracy under sections 18.2-499 and 18.2-500(A) of the Virginia Code

Under section 18.2-500(A) of the Virginia Code,

> Any person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499, may sue therefor and recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel, and without limiting the generality of the term, "damages" shall include loss of profits.

Section 18.2-500(A).  This section expressly depends on a successful cause of action under section 18.2-499, which provides,

> Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act, shall be jointly and severally guilty of a Class 1 misdemeanor. Such punishment shall be in addition to any civil relief recoverable under § 18.2-500.

Section 18.2-499.

---

[7] Of course, to the extent any funds are still within the Debtor's possession, the Myllenbecks would be entitled to turnover of such trust funds and any funds turned over would reduce the Debtor's liability.  However, to the extent those funds have already been dissipated, any outstanding amounts are recoverable as a claim against the Debtor.

A claim under this statute "focuses upon conduct directed at property, that is, one's business, and applies only to conspiracies resulting in business-related damages." *Bhattacharya v. Murray*, 515 F. Supp. 3d 436, 466 (W.D. Va. 2021), aff'd, 93 F.4th 675 (4th Cir. 2024) (quoting *Buschi v. Kirven*, 775 F.2d 1240, 1259 (4th Cir. 1985) (internal quotation marks omitted) and citing *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 321 (4th Cir. 2012) (stating it is "well-settled" that Va. Code § 18.2-499 does not apply to "personal or employment interests") (citing *Andrews v. Ring*, 266 Va. 311, 319,585 S.E.2d 780, 784 (2003)).

The Myllenbecks have alleged, among other things, that the Debtor, the Wharams and others conspired to "maliciously injur[e] the Plaintiffs in their continuing interest in the business of the Company relating to its operations prior to the closing by diverting the ERC Refunds from the Plaintiffs to their individual use unlawfully and without just cause or excuse in knowing disregard of the rights of the Plaintiffs." *See* Claim 2-1, Part 3, pg. 24. Despite their attempt to plead otherwise, the thrust of the business conspiracy claim is that the defendants conspired to deprive the Myllenbecks of the ERCs that were to be allocated to them following sale of the Myllenbecks' interest in Sonoma to Mr. Wharam. The problem, however, is that at the time of the acts of the alleged conspiracy, namely the application for and retention of the ERCs by the Debtor and the Wharams, the Myllenbecks had no business, as it had been sold to Mr. Wharam. In other words, the Myllenbecks' interest was not related to any present business, but instead a past one. Even if the funds that the Myllenbecks expected to receive were to be put to use in a future business, such harm is not cognizable under the statute. *Marcantonio v. Dudzinski*, 155 F. Supp. 3d 619, 636 (W.D. Va. 2015) (holding that harm to a future business or employment interest is not cognizable under Va. Code. § 18.2-499). As a result, regardless of whether there is a genuine dispute of material fact on this issue, which there appears to be with respect to whether Stacey Wharam was

an agent of the Debtor at the time for purposes of the intra-corporate conspiracy doctrine, the Court finds that the Myllenbecks are not entitled to judgment as a matter of law on this point. Accordingly, their request for treble damages under the statute is not allowable against the Debtor and summary judgment will be denied on that issue.

2. Whether the Debtor is liable for Civil Conspiracy

"Under Virginia law, the elements of a common law civil conspiracy are (i) an agreement between two or more persons (ii) to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, which (iii) results in damage to plaintiff." *William v. AES Corp.*, 28 F. Supp. 3d 553, 574–75 (E.D. Va. 2014) (citing *Firestone v. Wiley*, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007)). At least one member of the conspiracy must commit an "underlying tort" to satisfy the "unlawful" element. *Firestone*, 485 F. Supp. 2d at 703 (quoting *Almy v. Grisham* 639 S.E.2d at 189). Moreover, a corporate entity, acting through its agents, "cannot conspire with itself, so a conspiracy cannot exist if Defendants are agents of the same principle acting within the scope of agency." *White v. Potocska*, 589 F. Supp. 2d 631, 660 (E.D. Va. 2008) (citing *Phoenix Renovation Corp. v. Rodriguez*, 461 F.Supp.2d 411, 429 (E.D. Va. 2006)).

Here, there is no question that Mr. Wharam was an agent of the Debtor as he was the sole owner, but it is not clear whether Mr. Wharam was acting within the scope of his agency. With respect to Stacey Wharam, there appears to be a genuine dispute of material fact with respect to whether she was an agent of the Debtor. For example, the Myllenbecks note that Stacey Wharam has, until the petition date of this case, "intentionally been kept at arm's length from any ownership, management or employment role with the Debtor, quite clearly to avoid claims by her significant creditors… As a consequence, however, she must be considered an independent party and co-conspirator for purposes of the Claim." Docket No. 185, pg. 46. However, it appears from

the filings and the record before the Court, including the hearing on the competing summary judgment motions, that Stacey Wharam was a main point of contact for the Myllenbecks throughout the process of the sale and after it.  Many of the acts of the Debtor, including applying for the ERCs appear to have been overseen by Ms. Wharam.

Further, the civil conspiracy count names more parties than just the Wharams, including Joey Love, Love Low Taxes, Inc., and other related entities owned by Mr. Wharam.   Conspiracy requires a finding of purpose, and here the Court has little to no facts before it concerning the intent or purpose of Joey Love or Love Low Taxes, Inc.  While the Myllenbecks' Motion asserts that Joey and Love Low received a copy of the sale agreement, that does not mean that he or his company had knowledge of its contents.  *See* Docket No. 185, pg. 12.  The first mention in the Myllenbecks' Motion of Joey Love and Love Low being potentially aware of any alleged wrongdoing is in paragraph 28 thereof, which indicates they were part of a December 1, 2023 Zoom conference with the Wharams' counsel regarding the lawsuit that had been filed by the Myllenbecks.   The only asserted "undisputed fact" regarding Joey Love and Love Low's involvement is that in January of 2023, before the Zoom call, the Wharams asked Joey Love and Love Low to apply for the ERCs.  That alone does not establish knowing participation in a conspiracy.

Because of the genuine dispute as to (1) whether Joey Love and Love Low were part of an agreement to injure the Myllenbecks, and (2) whether Stacey Wharam was an agent of the Debtor prior to the petition date, the Court cannot grant summary judgment on the conspiracy claim as the only remaining participants in the conspiracy at that point would be Daniel Wharam and his wholly-owned entities.

Additionally, the Myllenbecks urge the Court to apply an exception to the intra-corporate conspiracy doctrine, arguing that the 4th Circuit has recognized an exception to the doctrine where the agent has an "independent personal stake" in achieving the corporation's illegal objectives.   In support thereof, the Myllenbecks cite to *Buschi v. Kirven*, 775 F.2d 1240, 1252 (4th Cir. 1985), and *Greenville Publishing Co. Inc. v. Daley Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974). However, both cases spoke of the exception in the context of conspiracy under various federal laws, not under Virginia law.

Finally, the Myllenbecks argue that an independent personal stake exists where the purported agent acts in contravention of the entity's duties and interests to his own financial benefit and under such circumstances Mr. Wharam should be and is deemed to be an independent party.[8]   This argument fails because the Court has already determined that there are genuine disputes as to whether Mrs. Wharam, Joey Love and Love Low were part of an agreement to injure the Myllenbecks or were agents of the Debtor.

Accordingly, the Court will deny summary judgment on the conspiracy claim.

D.  Whether the Debtor is liable for tortious interference with contractual rights

Virginia law recognizes a claim for tortious interference with contractual rights where the following elements are met: 1) the existence of a valid contractual relationship; 2) knowledge of the relationship on the part of the interferer; 3) intentional interference inducing or causing a breach of the relationship; and 4) resulting damage to the party whose relationship has been disrupted. *Chavez v. Johnson*, 230 Va. 112, 120 (1985).  Generally, a party to a contract cannot tortiously interfere with his own contract.   *Fox v. Deese*, 234 Va. 412 (1987).  However, the Myllenbecks

---

[8] Docket No. 209, Hr. Tr. 16:15-25.

assert that an exception exists where the maker of the contract conspires with others to break the contract. *Stauffer v. Fredericksburg Ramada Inc.*, 411 F.Supp. 1136 (E.D. Va. 1976).

The Myllenbecks have asserted that the participants in this tort were the same named for the conspiracy counts, including the tax professionals, the Wharams, and Mr. Wharam's wholly-owned entities, including the Debtor.   In fact, the entire premise of this cause is based on the conspiracy.  Accordingly, for the same reasons the Court has denied summary judgment on the conspiracy counts, the Court must deny summary judgment on the tortious interference counts.

E. Other Damages and Requested Relief

1. Whether the Debtor is liable for punitive damages.

In addition to compensatory damages, the Myllenbecks,assert a right to $350,000 in punitive damages in connection with the conspiracy claims and the tortious interference claims.  However, because the Court has denied summary judgment on those claims, the Court cannot at this time find that such amounts are allowable against the Debtor.

2. Whether the Debtor should be liable for attorneys' fees

A request for attorneys' fees depends on whether the Myllenbecks can point to a contractual or statutory right to such fees.[9]  They base their request for fees on section 20 of the sale agreement. The sale agreement itself imposes no obligation on the Debtor to cover attorneys' fees.  Further, the implied-in-fact contract to which the Debtor is subject, unlike the obligation to allocate the ERCs to the Myllenbecks, does not extend to any provision of attorneys' fees because there is no basis to find that the conduct of the parties manifested an intent for the Debtor to be responsible for such fees.  Indeed, unlike the ERCs, the attorneys' fees provision does not refer in any way to the Debtor or the Debtor's property.  The Court notes that the Myllenbecks included their request

---

[9] To the extent the Myllenbecks rely on *Prospect Dev. Co. Inc. v. Bershader*, 258 Va. 75, 92 (1999) for an award of attorneys fees, none of the exceptions outlined therein entitle the Myllenbecks to attorneys' fees from the Debtor.

for attorneys' fees in connection with their claims for civil conspiracy, business conspiracy, and tortious interference. The Court has denied summary judgment with respect to those theories.

Accordingly, based on the foregoing and without another independent basis to award them, the Court finds that attorneys' fees are not allowable at this time against the Debtor as a matter of law.

3. Whether the Court will award pre-judgment and post-judgment interest

In Virginia, an award of pre-judgment interest may be granted at the discretion of the trial court. *Skretvedt v.Kouri*, 445 S.E.2d 481, 487 (Va. 1994). An award of pre-judgment interest serves "to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *West Virginia v. United States*, 479 U.S. 305, 310 n.2 (1987).

Under Virginia law, the trial court "may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence." *Tech. & Supply Mgmt. v. Johnson Controls Bldg. Automation Sys., LLC.*, Civ. Action No. 1:16-cv-303, 2017 WL 3219281, at *20 (E.D. Va. July 28, 2017) (quoting Va. Code Ann. § 8.01-832). "Whether and for what period to grant such an award are decisions committed to the trial court's discretion." *Id*. In exercising that discretion, a court should balance the equities of the case, weighing "the desire to make the prevailing party whole, including compensation for its lost ability to use the money to which it was rightfully entitled, [against] the losing party's right to litigate a bona fide legal dispute." *Id*.

In the matter before the Court, while the Myllenbeck Claim and its attachments asserted a right to pre-judgment and post-judgment interest, the Myllenbecks made no argument as to why it is

entitled to pre-judgment interest or how to calculate such amounts in its papers, nor did it make any presentation on those points at the summary judgment hearing.  Further, the liability in this matter, although determined by way of this Court's summary judgment ruling, was not necessarily straight forward because the Debtor was not an express party to the sale agreement and liability depended on the Court ruling on the implied-in-fact contract and constructive trust theories.  On balance, and given that the Myllenbecks failed to make an adequate showing to demonstrate their entitlement to pre-judgment interest, the Court will exercise its discretion and disallow any claim to pre-judgment interest, instead finding that the Court's ruling on the breach of contract and constructive trust theories (in addition to the post-judgment interest discussed below) are sufficient to make the Myllenbecks whole.  *See Bickley v. Gregory*, Civ. Action No. 2:16-cv-131, 2016 WL 6306148, at *11 (E.D. Va. Oct. 7, 2016) (recommending denial of award of pre-judgment interest where the plaintiff failed to offer an explanation as to the appropriateness of such award), report and recommendation adopted, 2016 WL 6398804, at *1 (E.D. Va. Oct. 26, 2016).

Contrary to pre-judgment interest, post-judgment interest is mandatory.  *Upper Occoquan Sewage Auth.*, 275 Va. at 63 (citing Va. Code Ann. § 8.01-382; *Dairyland Ins. Co. v. Douthat*, 248 Va. 627, 631 (1994)). "[P]ostjudgment interest is not an element of damages, but is a statutory award for delay in the payment of money actually due." *Dairyland Ins.*, 248 Va. at 632 (citing *Nationwide Mut. Ins. Co. v. Finley*, 215 Va. 700, 702 (1975)).  Given that this Court's summary judgment ruling will impose liability on the Debtor, the Court finds that post-judgment interest on the $474,914.31 owed to the Myllenbecks for the past ERCs shall accrue at the federal judgment rate set forth in 28 U.S.C. § 1961.  Such interest will begin to accrue from the date this Court enters judgment pursuant to a separate order consistent with this opinion.

**Conclusion**

Based on the reasoning set forth herein, the Court will 1) grant summary judgment to the Myllenbecks and allow their claim in the amount of $474,914.31, representing the ERCs that have already been processed, 2) enter judgment against the Debtor and in favor of the Myllenbecks in the amount of $474,914.31, with post-judgment interest to accrue as set forth above; and 3) impose a constructive trust in favor of the Myllenbecks over any in-process ERC refunds for the 2020 and 2021 tax years upon receipt thereof by the Debtor.  The Court will deny summary judgment on the issues of business conspiracy, civil conspiracy, tortious interference, punitive damages and attorneys' fees and will, at this time, disallow any amounts asserted in connection with these theories.

Counsel for the Myllenbecks shall submit an order granting summary judgment consistent with this Opinion, and a separate judgment against the Debtor consistent with this Opinion, within 14 days of the entry of this Opinion.

The parties are hereby instructed to jointly notice a status conference at a mutually agreeable time to address any remaining issues related to this matter.

The Clerk shall provide copies of this Opinion and electronic notice of its entry to all counsel of record.

Date: Feb 18 2026

/s/ Klinette H Kindred

Klinette H. Kindred
United States Bankruptcy Judge

Entered On Docket: Feb 19 2026